IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| TIMBER RIDGE ESCAPES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:17-cv-03169-MDH |
| | ) | |
| QUALITY STRUCTURES | ) | |
| OF ARKANSAS, LLC, | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| Defendant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WELK RESORT GROUP, INC. | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |

**TIMBER RIDGE ESCAPES, LLC and WELK RESORT GROUP, INC.'s
SUGGESTIONS IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT TESTIMONY**

**TABLE OF CONTENTS**

STATEMENT OF FACTS ...........................................................................................................a

ARGUMENT ........................................................................................................................... 1

I.   The Court should exclude Terry Yeager's opinion, reports, and testimony because they are irrelevant, unreliable, and prejudicial to Plaintiff, and are therefore inadmissible under Federal Rules of Evidence 702 and 403. ................................................................... 2

   A.   Yeager's opinions on damages are not relevant, unreliable, will not assist the jury and will prejudice Plaintiff because his two damages models disregard the Contracts between the Parties and are based upon an incorrect measure of damages. ........................................ 2

   B.   Yeager's opinions on the Project schedule are not relevant, will not assist the jury and will prejudice Plaintiff because they are conclusory and confusing to a jury. ...................... 9

II.   The Court should exclude Joseph Page's opinion, report, and testimony because they are irrelevant, unreliable, and prejudicial to Plaintiff, and are therefore inadmissible under Federal Rules of Evidence 702 and 403. ........................................................................... 11

III.   The Court should exclude Josh Holland's opinion, report, and testimony because they are irrelevant, unreliable, and prejudicial to Plaintiff, and are therefore inadmissible under Federal Rules of Evidence 702 and 403. ............................................................................. 13

i

SPH-2186643-5

# TABLE OF AUTHORITIES

## Cases

*Bd. of Educ., Monongalia Cty., W. Va. v. Mellon-Stuart Co.*, 885 F.2d 864 (4th Cir. 1989) ......... 5

*Boca Raton Community Hosp. v. Tenet Healthcare Corp.*,
   502 F. Supp. 2d 1237 (S.D. Fla. 2007) ................................................................................. 9

*Bonner v. ISP Technologies, Inc.*,
   259 F.3d 924 (8th Cir. 2001) ............................................................................................ 1, 2

*Cole v. Homier Distributing Co., Inc.*, 599 F.3d 856, 865 (8th Cir. 2010) .................................. 2

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
   363 F.3d 761 (8th Cir. 2004) ................................................................................................. 2

*Cross v. Robinson*, 281 S.W.2d 22, 26 (Mo. App. 1955) ............................................................. 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .......................................................................................................... 1, 2

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
   744 F. Supp. 2d 870 (E.D. Wis. 2010) .................................................................................. 3

*Herbert & Brooner Const. Co. v. Golden*, 499 S.W.2d 541, 545 (Mo. App. 1973) ...................... 5

*In re Crisomia*,
   286 B.R. 604 (Bankr. E. D. Pa. Dec. 4, 2002) ...................................................................... 3

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................................... 1

*Lauzon v. Senco Products, Inc.*,
   270 F.3d 681 (8th Cir. 2001) ............................................................................................ 1, 2

*Lockwood Greene E&C, Inc. v. Scott & White Mem'l Hosp.*, 2007 WL 9710559, at *6 (W.D.
   Tex. June 21, 2007) ................................................................................................................ 5

*Meterlogic, Inc. v. KLT, Inc.*,
   368 F.3d 1017 (8th Cir. 2004) ......................................................................................... 9, 10

*New Mexico v. General Elec. Co.*,
   335 F. Supp. 2d 1266 (D.N.M. 2004), *aff'd*, 467 F.3d 1223 (10th Cir. 2006) ........................ 3

*Platypus Wear, Inc. v. Clarke Modet & Co.*, 2008 WL 4533914, at *6 (S.D. Fla. Oct. 7, 2008) .. 3

*Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) .......................................................... 1

*R&R Intern., Inc. v. Manzen, LLC*,
   2010 WL 3605234 (S.D. Fla. Sept. 12, 2010) ......................................................... 2, 9, 10, 12

*Roth v. Equitable Life Assur. Soc. of U.S.*, 210 S.W.3d 253, 262 (Mo.App. 2006) ...................... 6

*Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) ................................................................... 12, 14

*Target Strike, Inc. v. Marston & Marston, Inc.*,
   2011 WL 1212736 (W.D. Tex. Mar. 24, 2011) ...................................................................... 9

*The Baker Group, L.C. v. Burlington Northern Santa Fe Ry. Co.*,
   2003 WL 25774303 (W.D. Mo. May 2, 2003) ....................................................................... 3

*U.S. v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ......................................................................................... 2, 9

*Validsa, Inc. v. PDVSA Servs., Inc.*, 424 F. App'x 862, 875 (11th Cir. 2011) ......................... 6, 13

*Ward v. Fears*,
   2003 WL 25686523 (W.D. Mo. Mar. 18, 2003) ..................................................................... 2

## Other Authorities

American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility
   of Expert Testimony after *Daubert*, 157 F.R.D. 571, 579 (1994) ........................................ 10

SPH-2186643-5

**Rules**

Fed. R. Evid. 104(a) ..................................................................................................................... 2
Fed. R. Evid. 104(a) ..................................................................................................................... 2
Fed. R. Evid. 403 .......................................................................................................................... 2
Fed. R. Evid. 702 ..................................................................................................................... 1, 10
Fed. R. Evid. 702 advisory committee's note (2000) ................................................................. 10

SPH-2186643-5

## STATEMENT OF FACTS

On July 22, 2015, Timber Ridge Escapes, LLC ("TRE") and Quality Structures of Arkansas, LLC ("Quality Structures") (collectively, the "Parties") entered into four contracts (the "Contracts") for the construction of Buildings 8-9 and Building Pads 10-11 of the Timber Ridge Escapes project located at 1984 State Highway 165 in Branson, Missouri (the "Project"). ***Ex. A, B, C, D*** (Contracts for Buildings 8, 9 and Building Pads 10, and 11, respectively)[1]. TRE hired Quality Structures as the general contractor for the Project.

During the course of construction, TRE identified numerous and ongoing problems with Quality Structures' performance, including safety, workmanship, and appropriate staffing of properly skilled workers. Quality Structures failed to meet its substantial completion deadlines, failed to provide adequate substantiation for the change order requests that it submitted, and as late as February of 2017, Quality Structures continued to inadequately staff the Project with properly skilled workers. Due to Quality Structures' repeated failures and refusals to provide adequate properly skilled workers for the Project the Project pace and quality suffered.

TRE terminated the Contracts effective February 6, 2017 following a threat of damage to the Project made by a Quality Structures Superintendent to the TRE Project Manager. Quality Structures submitted final pay applications for Building 8 and Building Pads 10 and 11 on February 10, 2017[2]. ***Ex. E*** (final pay applications). Quality Structures prepared the payment applications which included three figures relevant to this motion: 1) the guaranteed maximum price, adjusted by change orders ("contract sum to date"); 2) the amount of approved change orders ("Net Change by Change Orders") and 3) the amount Quality Structures alleged was due

---

[1] The Contracts provided as Exhibits A-D have certain irrelevant exhibits omitted due to length.
[2] The final pay applications for Building 9 were submitted on December 10, 2016 due to a fire that destroyed that building and are included in Exhibit E.

("current payment due"). ***Ex. E.*** A representative of Quality Structures signed and notarized the payment applications the day following termination.

Although TRE disputes the amounts allegedly due Quality Structures in the pay applications, Quality Structures has now demanded over 35% more than the pay applications state as due through the improper use of experts, as further described below.

The Contracts are Cost Plus agreements with a Guaranteed Maximum Price. The Contracts allow for adjustments in the Guaranteed Maximum Price through written change orders approved by TRE. TRE's Count I requests that the Court declare the rights of the Parties pursuant to the respective Contracts. More importantly, Quality Structures' Counts II, IV, VI, IX claim breach of the respective contracts. Quality Structures' Counts VIII and XI request reformation of the Contracts and Count XII is for quantum meruit.

Quality Structures designated Terry Yeager ("Yeager") as an expert with opinions about the Parties' performance, damages, termination, and issues related to equipment. Yeager issued an Initial and Updated Report that provided a schedule analysis and damages analysis related to the Project. ***Ex. F*** (Yeager Report). Quality Structures designated Joseph D. Page ("Page") as an expert with opinions about damages. Page issued a report with conclusions regarding costs Quality Structures allegedly incurred for work on the Project. ***Ex. G*** (Page Report). Lastly, Quality Structures designated Josh Holland ("Holland") as an expert with opinions about the quantity of rock and other material excavated by Quality Structures at the project site. Holland issued a report in the form of a letter and a "Quantity Takeoff Synopsis." ***Ex. H*** (Holland Report). Although Yeager and Page were provided the Contracts for review, none of the opinions take into consideration the contractual provisions, which identify how the costs of construction are to be paid and were paid until termination.

b

**ARGUMENT**

A district court should apply a three-part test when screening testimony under Rule 702: 1) evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact; 2) the proposed witness must be qualified to assist the finder of fact; and 3) the proposed evidence must be reliable or trustworthy, so that, if accepted as true, it provides assistance to the fact finder. *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008). The United States Supreme Court provided a non-exhaustive list of factors for analyzing the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591-95 (1993). These factors include: "1) whether the theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the theory has been generally accepted." *Lauzon v. Senco Prods. Inc.*, 270 F.3d 681, 687 (8th Cir. 2001) (quoting *Peitzemeier v. Hennessy Indus., Inc.*., 97 F.3d 293, 297 (8th Cir. 1996)).

Furthermore, Federal Rule of Evidence 702 "imposes a special obligation upon a trial judge" to ensure that expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). The objective of the gatekeeping requirement imposed by this rule "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The rule's concern with scientific, technical, or specialized knowledge "is a reliability requirement, while the requirement that the evidence assist the trier of fact . . . is a relevance requirement." *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (internal quotations omitted).

"Although the factual basis of an expert's opinion is generally an issue of credibility rather than admissibility, an expert's opinion should be excluded if it 'is so fundamentally

1

unsupported that it can offer no assistance to the jury.'" *Cole v. Homier Distributing Co., Inc.*, 599 F.3d 856, 865 (8th Cir. 2010) (quoting *Bonner*, 259 F.3d at 929-30). The district court's role as gatekeeper is important "because of the powerful and potentially misleading effect of expert evidence," and judges "must take care not to allow misleading and prejudicial opinions to influence the finder of fact." *R&R Intern., Inc. v. Manzen, LLC*, 2010 WL 3605234, at \*16 (S.D. Fla. Sept. 12, 2010) (citing *U.S. v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004)).

In determining the reliability of the expert's proffered testimony, the court may evaluate one or all of the non-exclusive factors employed by the Supreme Court in *Daubert*. *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 776-77 (8th Cir. 2004). The district court may also consider whether the expert's methodology has been contrived to reach a particular result. *R&R Intern., Inc., LLC*, 2010 WL 3605234 at \*8.

The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001); Fed. R. Evid. 104(a). Additionally, expert witness testimony that is otherwise admissible must pass muster under Federal Rule of Evidence 403, in that its probative value cannot be substantially outweighed by the danger of unfair prejudice and the risk of misleading the jury.

I.  **The Court should exclude Terry Yeager's opinion, reports, and testimony because they are irrelevant, unreliable, and prejudicial to Plaintiff, and are therefore inadmissible under Federal Rules of Evidence 702 and 403.**

A.  **Yeager's opinions on damages are not relevant, unreliable, will not assist the jury and will prejudice Plaintiff because his two damages models disregard the Contracts between the Parties and are based upon an incorrect measure of damages.**

An opinion that does not calculate damages based upon the correct measure of damages is of no assistance to the trier of fact and is, therefore, irrelevant. *See, e.g., Ward v. Fears*, 2003 WL 25686523, at \*3 (W.D. Mo. Mar. 18, 2003) (finding that expert's opinion regarding measure

2

of damages "will not assist the jury" and "might potentially confuse the jury because it is the Court's job to instruct the jury on the appropriate measure of damages"). Furthermore, there is an "**obvious danger of putting unrealistic damage figures before the jury**," because such evidence "could easily confuse the jury and result in a decision that is contrary to applicable law." *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 900 (E.D. Wis. 2010) (emphasis added). "Ultimately, every expert witness who calculates damages sustained from a breach of a given contract must assume the contract's enforceability under the law." *Platypus Wear, Inc. v. Clarke Modet & Co.*, 2008 WL 4533914, at *6 (S.D. Fla. Oct. 7, 2008).

1. **Both Damages Models completely disregard the Guaranteed Maximum Price in the Contracts.**

For an expert's opinion to be reliable, it must be "squarely grounded in principles and methodology of the relevant discipline, no matter how impressive the expert's credentials may be." *The Baker Group, L.C. v. Burlington Northern Santa Fe Ry. Co.*, 2003 WL 25774303, at *7 (W.D. Mo. May 2, 2003) (quoting *In re Crisomia*, 286 B.R. 604 (Bankr. E.D. Pa. Dec. 4, 2002)). The court, acting as gatekeeper, is not required to admit opinion evidence merely because an expert states that a methodology is valid. *Id.*

Yeager disregards the terms of the Contracts in several material manners. Most significantly, neither damage model he uses recognizes the Guaranteed Maximum Price ("GMP") as provided in the Contracts. The Contracts include a GMP for each building or building pad and provide for a way to vary the GMP through approved written change orders. Quality Structures was aware of the change order method of adjusting the GMP, as evidenced both by the contractual language and the practice of the Parties of executing multiple change orders throughout the course of the Project. Despite that, Yeager ignores the initial GMP and the

3

Contract's procedure for obtaining change order adjustments and proceeds with two damages calculations that far exceed the scope of that amount.

Yeager's Damage Model 1 is a damages model essentially adding up all unsigned change order requests and alleged errors on the original GMP for Buildings 8 and 9 to come up with a total that far exceeds the last pay applications submitted by Quality Structures post-termination. Yeager admits that the way he calculated this model is <u>not based on any industry standard or treatise.</u> He states: "**There's no treatise that I'm aware of that tells you specifically to do it the way I did it**." *Ex. I* (Yeager Deposition), 117:8-14 (emphasis added). Damages Model 1 mentions the GMP but adjusts it not only by change orders but by <u>change order requests</u> that TRE never approved. The Contracts require that adjustments to the GMP be made in writing and approved by TRE. *Ex. A-D*, Section 6. 1 of Agreement and Section 7.3.3 of General Conditions. Many of the change order requests included in Yeager's Damages Model 1 were submitted by Quality Structures only after its termination. The change order requests that Yeager included that <u>were</u> submitted prior to termination were rejected and Quality Structures did not object to the rejection or otherwise follow the process for claims provided in the Contracts. *See Ex. I*, 65:5-67:9.

TRE had no duty to approve every change order request Quality Structures issued. The Contracts state that a Change Order is a written instrument signed by both the Owner and the Contractor stating their <u>agreement</u> regarding changes in the work, contract sum, or contract time. *Ex. A-D*, Section 7.2 of General Conditions. As is clear in the language of the Contracts, Quality Structures cannot unilaterally determine that it will adjust the GMP in the Contracts. Multiple courts have affirmed the principle that merely submitting a change order request does not bind an owner to accept that change order. *See e.g., Lockwood Greene E&C, Inc. v. Scott & White Mem'l*

4

*Hosp.*, 2007 WL 9710559, at *6 (W.D. Tex. June 21, 2007) ("the parties unambiguously required the approval of Defendants [owner] to authorize a Change Order, which would change the scope and/or Contract Price . . . **Lockwood [contractor] has not produced any written Change Orders to the Contract that obligate Defendants [owner] to pay Lockwood sums above the Contract Price**.") (emphasis added); *Herbert & Brooner Const. Co. v. Golden*, 499 S.W.2d 541, 545 (Mo. App. 1973) ("Plaintiff's claim for additional work was denied because not done in accordance with the change order procedure of the contract.").

Damages Model 2 completely ignores the presence of a GMP in the Contracts and appears to conduct a total cost analysis of the expenses generated for the Project. The total cost method is not appropriate for calculating alleged damages above the amount of a GMP because any cost in excess of that amount is a loss born by the contractor. *See Bd. of Educ., Monongalia Cty., W. Va. v. Mellon-Stuart Co.*, 885 F.2d 864 (4th Cir. 1989) (unpublished disposition) ("Costs with regard to three of the five projects ultimately exceeded the project GMP, and CCC [operating in the place of a general contractor], as per the contract, bore those costs.").

Moreover, Yeager's selective reference to certain parts of the contract demonstrates his decision to cherry pick parts of the agreement in order to come to a conclusion apparently favorable to Quality Structures regardless of the Parties' prior dealings. *See Bamberger v. Clark*, 390 F.2d 485, 488 (D.C. Cir. 1968) ("since the expert relied on the contract itself we do not believe she could disregard the contract provision…"). Yeager offered contradictory testimony both that he would not discuss the terms of the contract because he is not a lawyer and then independently raises contract provisions out of context in an attempt to justify his untested damage model.

5

Lastly, Yeager relied exclusively on Page's report for forming his opinion on the amount Quality Structures expended on the Project. As discussed below, Page did not verify that the costs Quality Structures identified were actually for work on the Project. Relying on such unsubstantiated accounting results in a fundamentally unreliable opinion and should not be provided to the jury.

The Court should exclude Yeager's opinions regarding damages because his disregard for the agreement of the Parties evidenced in the Contracts, and his cherry-picking approach to those Contracts, results in irrelevant information that would confuse the jury and not provide help to the trier of fact as required in Rule 702(a). *See Validsa, Inc. v. PDVSA Servs., Inc.*, 424 F. App'x 862, 875 (11th Cir. 2011) (affirming trial court's decision to exclude certain expert testimony on certain damages because there was no contractual right to such amounts).

### 2. Both Damages Models completely disregard the cap on damages for any equitable claims.

"The rule is that in a suit on quantum meruit based upon a contract, the plaintiff cannot recover in excess of the contract price." *Cross v. Robinson*, 281 S.W.2d 22, 26 (Mo.App. 1955). Additionally, "[P]romissory estoppel is not available ... when an unambiguous contract exists that covers the issue for which damages are sought.'" *Roth v. Equitable Life Assur. Soc. of U.S.*, 210 S.W.3d 253, 262 (Mo.App. 2006) (quoting *Halls Ferry Investments, Inc., v. Smith*, 985 S.W.2d 848, 853 (Mo.App. 1998)).

Regardless, the Parties contractually agreed to waive claims that rely on theories of unjust enrichment as a means to increase the GMP. The Contracts state:

> No change in the Work, whether by way of alteration or addition to the Work, shall be the basis of an addition to the Contract Sum or a change in the contract Time unless and until such alteration or addition has been authorized by a change Order or written authorization to proceed executed and issued in accordance with and in strict conformance with the requirements of the Contract Documents or

6

otherwise by a written directive from the Owner. This requirement is of the essence of the Contract Documents. **Accordingly, no course of conduct or dealings between the Owner and Contractor, nor express or implied acceptance or alterations or additions to the Work, and no claim that the Owner has been unjustly enriched by alteration or addition to the Work, whether or not there is in fact any such unjust enrichment to the Work, shall be the basis of any Claim to an increase in the Contract Sum or change in the Contract Time.**

**Ex. A-D,** Section 4.3.11 of General Conditions, (emphasis added). This provision and the common law prohibition on exceeding the contract price for equitable recovery for which a contract exists both limit alleged damages to the GMP in the Contracts. Therefore, expert opinions providing damage models exceeding the GMP without some reasonable explanation would not provide any help to the jury.

3. **Both Damages Models completely disregard Quality Structures' contemporaneous admission of alleged damages.**

Not only does Yeager ignore the terms of the Contract limiting contractor costs to the GMP, he also ignores Quality Structures' own admissions of money-owed reflected in the final pay applications for the Project issued post-termination and completion of work reflected in signed lien waivers.

Quality Structures submitted final pay applications with requests for retainage and final work on February 10, 2017[3]: four days following TRE's termination of Quality Structures from the Project. *Ex. E*. Quality Structures stated in the final pay application for each building the "Net Change By Change Orders" and the "Current Payment Due."

Yeager completely disregards Quality Structures' contemporaneous statements regarding what payment it claimed was owed at time of termination and which change order requests had been approved as to adjust the GMP in the Contracts. The final pay applications show Quality

---

[3] Pay applications for Buildings 8 and 9 submitted post-termination were for retainage and final work. Pay applications for 10 and 11 submitted post-termination were just for final work.

7

Structures' understanding of the actual adjusted GMP – a figure significantly different from what Yeager identifies in his report. ***See Ex. E, F.*** Yeager testified that even though he looked at the final pay applications,[4] he gave no consideration to these vital issues for calculating damages.

Yeager also failed to acknowledge that multiple change order requests that he included as part of Damages Model 1 were issued post-termination **and** were for work that Quality Structures had stated was completed over a year prior. ***Ex. J*** (post-termination excavation change orders). Indeed, Quality Structures provided lien waivers for this work. ***Ex. K*** (pay applications indicating 100% completion of excavation line item and providing lien waiver covering that work). **Despite the presence of signed lien waivers for the excavation work completed over a year prior, Quality Structures submitted post-termination change order requests for all four buildings totaling $1,466,725.54 for the same work!** ***Ex. J.*** Yeager offered <u>no explanation</u> for this discrepancy or support for the far-reaching claim that Quality Structures could assert a post-termination claim for that amount in conflict with its earlier lien waivers and assurance of work completion. An ability to ignore the prior evidence would render the lien waiver meaningless.

Neither Yeager nor Page, who Yeager solely relied on for the amount of total alleged costs, ***Ex. I***, 43:18-44:8, attempted to allocate those costs to the particular pay applications in which Quality Structures accounted for them. ***Ex. L*** (Page Deposition), 26:23-27:5. Such information is critical given the signed lien waivers Quality Structures produced for work completed for at least 19 of the 21 months they were on the Project. The Court should not allow expert testimony be presented to a jury on unsubstantiated and unallocated total cost figures when large portions of those alleged costs are not legally recoverable.

---

[4] For purposes of evaluating work remaining to be completed.

Presentation of evidence of an incorrect measure of damages is irrelevant to a jury's determination of a correct measure of damages figure, and will likely mislead and confuse a jury. *See Boca Raton Community Hosp. v. Tenet Healthcare Corp.*, 502 F. Supp. 2d 1237, 1250 (S.D. Fla. 2007) (excluding expert opinion based upon incorrect measure of damages because it "would confuse and mislead the jury"); *Target Strike, Inc. v. Marston & Marston, Inc.*, 2011 WL 1212736 (W.D. Tex. Mar. 24, 2011) (finding expert testimony should be excluded because report failed to address avoided costs and therefore "provides an incorrect measure of damages which is irrelevant to any fact in issue"). An expert's opinion regarding total cost method of calculating damages – with no explanation or justification of the variance in the Party's past admissions – would mislead and confuse a jury.

Indeed, in addition to being of no assistance and irrelevant on the issue of damages, Mr. Yeager's opinion would be confusing to the jury and highly prejudicial to Plaintiff because it would present the jury with an inflated and improper measure of damages which could result in a potential windfall for Defendant. It is axiomatic that testimony of expert witnesses may be highly influential to the jury and that misleading expert testimony risks significant prejudice to the opposing party. *See, e.g., R & R Intern., Inc.*, 2010 WL 3605234 at *16 (citing *U.S. v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004)). Yeager should be prohibited from presenting such misleading, irrelevant and highly prejudicial opinions to a jury that would provide an impression that damages in a <u>breach of contract</u> action are an anything-goes proposition.

**B. Yeager's opinions on the Project schedule are not relevant, will not assist the jury and will prejudice Plaintiff because they are conclusory and confusing to a jury.**

Mr. Yeager's opinion on schedules should also be excluded because it is fundamentally unreliable. "The district court <u>must</u> exclude expert testimony if it is so fundamentally unreliable that it can offer no assistance to the jury[.]" *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019

9

(8th Cir. 2004) (emphasis added). The conclusions of an expert "must be supported by good grounds for every step in the analysis, and if any step is rendered unreliable, the expert's testimony is inadmissible." *R&R Intern., Inc.,* 2010 WL 3605234 at *9. "The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert **must explain how the conclusion is so grounded**." Fed. R. Evid. 702 advisory committee's note (2000) (emphasis added) (citing American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility of Expert Testimony after *Daubert*, 157 F.R.D. 571, 579 (1994)).

Yeager developed an As Built schedule for the Project in connection with his report. However, he disregarded crucial elements of the Contracts, the conduct of the Parties (i.e., history of change order requests or lack thereof), and ultimately was unable to provide any opinions on issues outside of the scope of his conclusory allegations advantageous to Quality Structures.

One of Yeager's opinions included in his Updated Report conclusively states: "Quality Structures did not delay the construction of Building 8" and "Quality Structures did not delay the construction of Building 9." *Ex. F*, pp. 13, 17. Despite this confidence, Yeager was unable to identify who actually <u>did cause</u> the delay that he so decisively stated was not attributable to Quality Structures. He testified as follows:

> Mr. Wade: "your opinion in your report says 'Quality Structures did not delay the construction of Building 8.' Are you prepared now to give an opinion as to who caused the delay?"
>
> Mr. Yeager: "Hmm. I think I'm more prepared to say it wasn't Quality Structures because there were other parties involved that contributed to the delay besides Welk. You know, there were utility issues they had to deal with and others. But at the end of the day, it was not Quality Structures. **I'd be speculating beyond that**." *Ex. I,* 58:5-14 (emphasis added).

10

Despite this testimony and multiple statements in Mr. Yeager's report that Quality Structures had not caused delays, he went on to concede that Quality Structures **was** a part of causing delays to the project when he stated: "Were there delays along the way that Quality Structures may have been involved with? Yeah." *Ex. I*, 60:12-14.

Furthermore, Yeager did not even consider the updates to the Project schedules provided by Quality Structures. *Ex. I,* 103:21-104:2. Thus, he offers no guidance on reasons Quality Structures own schedules identified drastically different completion dates mere months prior to termination. *Ex. I* ,111:22-112:4. Yeager's opinions regarding an As Built schedule developed in complete isolation from the terms of the Contracts, the facts regarding the interaction of the Parties, and purposeful ignorance of Quality Structures' own contemporaneous representations to TRE about the schedule are purely hypothetical and would confuse the jury without providing any benefit. Yeager should be prohibited from presenting such misleading, irrelevant and highly prejudicial opinions to a jury.

II.     **The Court should exclude Joseph Page's opinion, report, and testimony because they are irrelevant, unreliable, and prejudicial to Plaintiff, and are therefore inadmissible under Federal Rules of Evidence 702 and 403.**

Page's opinions will not provide any assistance to the trier of fact, are based on unsubstantiated and incomplete material, and would unduly confuse the jury. Page testified as follows:

> Mr. Wade: "So the scope of your work was limited to reviewing this QuickBooks spreadsheet which is attached to your report and comparing it to other business records of Quality Structures which included Quality Structures invoices that they had created?"
>
> Mr. Page: "Correct."

*Ex. L,* 16:22-17:2. Page merely reviewed a spreadsheet <u>created by Quality Structures</u> and compared it with certain invoices and receipts corresponding to amounts on the spreadsheet in

order to form an opinion on the total cost Quality Structures incurred on the Project. Page testified that he did not verify any of the amounts listed on invoices created by Quality Structures, *Ex. L,* 15:4-14, did not consider any provisions on damages in the Contracts, *Ex. L,* 17:24-18:3; 29:11-30:6, did not determine whether the material costs included in his total were actually used on the Project, and did not see any verification that the time for Quality Structures' personnel included in the total was actually spent on the Project, *Ex. L,* 27:6-28:9. Indeed, his report states that he "assumed that all charges listed were related to the Project unless the provided checks, invoice or other supporting documentation clearly indicated otherwise." Ex. Report.

Page's conclusions regarding the total costs Quality Structures incurred for work on the Project are both unreliable and irrelevant. They are unreliable because he did not provide any verification that the amounts used to reach the total conclusion were actually a part of the Project. An expert opinion regarding the total amount incurred without any justification for those costs is improper because of the powerful and potentially misleading effect of expert evidence[.]" *R&R Intern., Inc.*, 2010 WL 3605234, at *16. They are irrelevant because, as discussed above, the Contracts only allow for total costs for damages purposes up to the GMP. Page's failure to mention the Contracts' provisions or allocate costs to the payment applications would confuse the jury.

Moreover, expert testimony is unnecessary to merely repeat information from documents that the jury can easily understand without need for an expert. *See Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) ("[E]xpert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge 'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of

SPH-2186643-5

comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation."). The Court should exclude Page's opinions because his failure to validate any of the expenses identified by Quality Structures and submission of total cost information despite the GMP in the Contracts would confuse the jury and not provide help to the trier of fact as required in Rule 702(a). *See Validsa, Inc. v. PDVSA Servs., Inc.*, 424 F. App'x 862, 875 (11th Cir. 2011) (affirming trial court's decision to exclude certain expert testimony on certain damages because there was no contractual right to such amounts).

**III.     The Court should exclude Josh Holland's opinion, report, and testimony because they are irrelevant, unreliable, and prejudicial to Plaintiff, and are therefore inadmissible under Federal Rules of Evidence 702 and 403.**

Holland's opinions are based on an estimate of the amount of excavation that was required for work Quality Structures performed on the Project. ***Ex. M,*** Holland deposition, 24:9-20. Holland testified that his calculation is purely a "best guess" and that he is not even able to identify a potential variance of accuracy due to the uncertain nature of calculating potential takeoffs. ***Ex. H; M,*** 42:23-43:17. Further raising doubt is the fact that Holland was asked to estimate the amount of excavation almost one year after the excavation was actually performed. his report notes in bold, italicized and underlined font that "***This takeoff is based off of provided bore logs, provided construction plans and stated work. As in all earthwork estimating this is a best guess estimate of quantities and should not be construed as anything more than an estimate.***" Ex. Holland Report. Even though excavation was completed, Holland did not go to the site, did not review change order requests related to the excavation, and was not provided and did not review the Pay Applications or Lien Waivers signed by Quality Structures related to the excavation work and was not provided information related to the actual cubic yards of rock and

13

fill removed from the site. *Ex. M,* 39:5-22. This was the first time he conducted his analysis after excavation was completed and building was completed. *Ex. M,* 40:2-10. The Court should exclude Holland's testimony because it is unnecessary for providing any assistance to the jury. *See Salem*, 370 U.S. at 35.

WHEREFORE, Timber Ridge Escapes, LLC and Welk Resort Group, Inc. request the Court exclude the opinion, report, and any testimony of Quality Structures of Arkansas, LLC's proposed experts Terry Yeager, Joseph Page, and Josh Holland, and for such other and further relief as the Court deems just and proper.

HUSCH BLACKWELL LLP

*/s/ Bryan Wade*
Bryan O. Wade      #41939
Ginger K. Gooch      #50302
Larissa M. Whittingham      #69417
901 St. Louis St., Suite 1800
Springfield, MO 65806
Telephone: 417-268-4000
Facsimile: 417-268-4040
E-Mail: bryan.wade@huschblackwell.com
       ginger.gooch@huschblackwell.com
       larissa.whittingham@huschblackwell.com

ATTORNEYS FOR TRE AND WELK RESORT GROUP, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing instrument was forwarded this 2nd day of October, 2018, by the court's electronic notification system, to all counsel of record.

*/s/Bryan Wade*
Attorney

14